AO 106 (Rev. 04/10)  Application for a Search Warrant



FILED
U.S. District Court
District of Kansas

# UNITED STATES DISTRICT COURT

for the

District of Kansas

NOV 04 2021

Clerk, U.S. District Court
By _____
Deputy Clerk

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>the premises and devices located at<br>1945 N. Rock Rd., Apt 1605, Wichita, Kansas<br>as further described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  21-M-6181-01-KGG

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 18 U.S.C. 2251 | Production of Child Pornography |
| 18 U.S.C. 2252A | Distribution/Receipt/Possession of Child Pornography |

The application is based on these facts:

See Attached Affidavit of Probable Cause.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Adam Christudoss, Special Agent, AF OSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 41(d)(3) by telephonic conferencing.

Date: Nov. 4, 2021

*Judge's signature*

The Honorable Kenneth G. Gale
*Printed name and title*

City and state:  Wichita, KS

**ATTACHMENT A**

**RESIDENCE to be Searched**

This warrant authorizes the search of the premises and devices located at 1945 N. Rock Rd., Apt 1605, Wichita, Kansas. This RESIDENCE is white with green accents and trim, wood paneled residential apartment building structure, facing South with 1605 on the front door of the apartment and a 16 marked above the doors of the apartment building. Apartment 1605 is a second floor apartment accessible by a first floor entry door, identified in the below photograph as the second green door from the left.

Attached is a photo of the RESIDENCE and its geographical location:





**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § § 2251 (Production of Child Pornography) and 2252A (Distribution/Receipt/Possession of Child Pornography):

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which are stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a) evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b) evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c) evidence of the lack of such malicious software;

    d) evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e)  evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f)  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g)  evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h)  evidence of the times the COMPUTER was used;

i)  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j)  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k)  records of or information about Internet Protocol addresses used by the COMPUTER;

l)  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m) contextual information necessary to understand the evidence described in this attachment.

3.  Routers, modems, and network equipment used to connect computers to the Internet.

4.  Child pornography, as defined in 18 U.S.C. § 2256(8), and child erotica.

5.  Records, information, and items relating to violations of the statutes described above including:

a. Records, information, and items relating to the occupancy or ownership of the RESIDENCE (described in Attachment A), including utility and telephone bills, mail envelopes, or addressed correspondence;

b. Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

c. Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

d. Records and information relating to the sexual exploitation of children, including correspondence and communications with or about the minors discussed in the attached Affidavit of probable cause;

e. Records and information showing access to and/or use of cloud storage providers; and

f. Records and information relating or pertaining to the identity of the person or persons using or associated with the Twitter account "outdoor21man2," the phone number 530-592-8157, the email address bradleywiley1604@gmail.com.

6.    During the execution of the search of the RESIDENCE described in Attachment A, law enforcement personnel are authorized to compel **Bradley WILEY** to (1) press or swipe the fingers (including thumbs) of **Bradley WILEY** to the fingerprint scanner of a device found at the RESIDENCE; and/or (2) hold a device found at the RESIDENCE in front of the face of **Bradley WILEY**, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant. [This warrant does **not** authorize law enforcement to compel any person(s) to state or otherwise provide the password for, or to identify which specific biometric

characteristics (including the unique finger(s) or other physical features) may be used to unlock or access, any device(s).]

7.      As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

8.      The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

9.      The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, CD/DVDs, gaming systems, SIM cards, cellular phones capable of storage, memory cards, memory chips, and other magnetic or optical media.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Adam S. Christudoss, Special Agent, United States Air Force Office of Special Investigations (OSI), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I have been a Special Agent with OSI since July 14, 2020, and am currently assigned to the Office of Special Investigations (OSI)[1] Detachment 321 (Det 321), McConnell AFB (MAFB), KS. I graduated from the Criminal Investigator Training Program and the Basic Special Investigator Course at the Federal Law Enforcement Training Center, in Glynco, GA. Most of the crimes I have investigated since that time have been related to sexual assault, rape, child pornography, or aggravated assault. I am an active duty military member and a Special Agent with the Office of Special Investigations. As such, pursuant to Rule 41 (b), Fed. R. Crim. P. and Section 60.2 of Title 28 of the Code of Federal Regulations, I am a federal law enforcement officer and I am authorized to request the issuance of a search warrant.

2.      I make this affidavit in support of an application for a warrant to search the premises and devices located at 1945 N. Rock Rd., Apt 1605, Wichita, Kansas (RESIDENCE) further described in Attachment A, for the things described in Attachment B.

3.      This affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the RESIDENCE specifically described in Attachment A of this affidavit, including any electronic devices and the content of electronic devices located therein, and any person located at the RESIDENCE, for contraband and evidence,

---

[1] OSI is a U.S. federal law enforcement agency that reports directly to the Inspector General, Office of the Secretary of the Department of the Air Force. OSI provides professional investigative services to commanders of all Department of the Air Force activities. Its primary responsibilities are criminal investigations and counterintelligence services.

fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2251, 2252 and 2252A, which items are more specifically described in Attachment B of this Affidavit.

4.      The statements in this affidavit are based in part on information provided by Twitter, the National Center for Missing and Exploited Children (NCMEC), and other law enforcement officers, including Olathe Police Department (OPD), and Wichita Police Department (WPD), OSI Det 321, and on my review and investigation into this matter.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251 (production of child pornography), 2252A(a)(2) (distribution/receipt of child pornography) and 2252A(a)(5)(B) (possession of child pornography) are presently located at the RESIDENCE described in Attachment A. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### Background on Twitter

5.      Twitter is an American microblogging and social networking service on which users post and interact with messages known as "tweets". Registered users can post, like, and retweet tweets, but unregistered users can only read those that are publicly available. Twitter also allows users to engage in direct messaging with other users.

6.      To use Twitter's service, a user must agree to Twitter's User Agreement which includes the Terms of Service,[2] Privacy Policy,[3] and Twitter's Rules and Policies.[4]

7.      As part of its Terms of Service, Twitter advises users that "We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment." Thus, Twitter alerts users that it may unilaterally remove content that involves unlawful conduct.

8.      Twitter's Privacy Policy alerts users to the types of information that Twitter requires from users and, conversely, information that Twitter may choose to share with others. For example, in Section 1.4 of Twitter's Privacy Policy, Twitter advises users "When you communicate with others by sending or receiving Direct Messages, we will store and process your communications and information related to them. This includes link scanning for malicious content, link shortening to http://t.co URLs, detection of spam, abuse and prohibited images, and use of reported issues." Thus, Twitter advises users that it scans direct messages for abuse and prohibited images. Likewise, in Section 3.3 of Twitter's Privacy Policy, Twitter advises users "Notwithstanding anything to the contrary in this Privacy Policy or controls we may otherwise offer to you, we may preserve, use, share, or disclose your personal data or other safety data if we believe that it is reasonably necessary to comply with a law, regulation, legal process, or governmental request; to protect the safety of any person; to protect the safety or integrity of our platform, including to help prevent spam, abuse, or malicious actors on our services, or to explain

---

[2] Available online at: https://twitter.com/en/tos

[3] Available online at: https://twitter.com/en/privacy

[4] Available online at: https://help.twitter.com/en/rules-and-policies#twitter-rules

why we have removed content or accounts from our services; to address fraud, security, or technical issues; or to protect our rights or property or the rights or property of those who use our services." Thus, Twitter advises users that, in Twitter's discretion, it may preserve, share, and disclose the user's data if Twitter believes that it is reasonably necessary to protect the public, Twitter's platform, or to prevent a variety of conduct that Twitter finds objectionable.

9.      As part of its Rules and Policies, Twitter advises users of its enforcement options that it may take in response to violations of the Terms, Rules, or Policies. In its Enforcement Philosophy,[5] Twitter advises users that "Certain types of behavior may pose serious safety and security risks and/or result in physical, emotional, and financial hardship for the people involved. These egregious violations of the Twitter Rules — such as posting violent threats, non-consensual intimate media, or content that sexually exploits children — result in the immediate and permanent suspension of an account." Thus, Twitter advises users that sexual exploitation of children is an egregious violation of Twitter's rules that will result in the immediate and permanent suspension of the account.

10.      As part of its Rules and Policies, Twitter expressly advises users that "We have zero tolerance for child sexual exploitation on Twitter." Twitter includes a link to its Sexual Exploitation Policy,[6] which further advises users "Twitter has zero tolerance towards any material that features or promotes child sexual exploitation, one of the most serious violations of the Twitter Rules. This may include media, text, illustrated, or computer-generated images. Regardless of the intent, viewing, sharing, or linking to child sexual exploitation material contributes to the re-victimization of the depicted children. This also applies to content that may further contribute to

---

[5] Available online at: https://help.twitter.com/en/rules-and-policies/enforcement-philosophy

[6] Available online at: https://help.twitter.com/en/rules-and-policies/sexual-exploitation-policy

victimization of children through the promotion or glorification of child sexual exploitation." Twitter identifies what, in its view, constitutes a violation of these rules, listing "Any content that depicts or promotes child sexual exploitation including, but not limited to: visual depictions of a child engaging in sexually explicit or sexually suggestive acts; illustrated, computer-generated or other forms of realistic depictions of a human child in a sexually explicit context, or engaging in sexually explicit acts; sexualized commentaries about or directed at a known or unknown minor; and links to third-party sites that host child sexual exploitation material." Twitter further advises users "The following behaviors are also not permitted: sharing fantasies about or promoting engagement in child sexual exploitation; expressing a desire to obtain materials that feature child sexual exploitation; recruiting, advertising or expressing an interest in a commercial sex act involving a child, or in harboring and/or transporting a child for sexual purposes; sending sexually explicit media to a child; engaging or trying to engage a child in a sexually explicit conversation; trying to obtain sexually explicit media from a child or trying to engage a child in sexual activity through blackmail or other incentives; identifying alleged victims of childhood sexual exploitation by name or image; and promoting or normalizing sexual attraction to minors as a form of identity or sexual orientation."

11.     As related to child sexual exploitation, Twitter goes on to explain "the consequence for violating our child sexual exploitation policy is immediate and permanent suspension." Twitter further advises users "when we're made aware of content depicting or promoting child sexual exploitation, including links to third party sites where this content can be accessed, they will be removed without further notice and reported to the National Center for Missing & Exploited Children (NCMEC)."

**Twitter detects and reports child sexual exploitation on its service**

12.     On or about May 26, 2021, Twitter submitted a CyberTipline Report 91244083 to NCMEC identifying Twitter user "outdoor21man2" had uploaded a file depicting an apparent underage child engaged in sexually explicit conduct (described below).

13.     The image identified by Twitter as child pornography (identified as zW-dz4H0.jpg) depicted an apparent underage female with blonde hair sitting naked on a mirrored table or counter. The female was holding a pink razor near her genitals. The female in the image had undeveloped breasts and did not appear to have any vaginal pubic hair growth. Twitter's report advised Twitter had reviewed the contents of the uploaded file.

14.     As part of its report, Twitter also provided user/account information, including IP logs, the user's/account's associated phone (+15305928157) and email address (bradleywiley1604@gmail.com). Twitter also provided certain user-provided account information, which included the user's self-identified location (Wichita, KS) and the user's self-description (26M, taboo is where it's at bitches!).

15.     Along with the reported image, Twitter included a zip file as part of its report. Twitter advised:

> This report was submitted from the Electronic Service Provider (ESP) Twitter, a free service that provides micro-blogging to its users. This is being reported to NCMEC in accordance with Title 18 U.S.C. 22558A. The submitted media along with the .zip file containing preservation files will be kept for 90 days for law enforcement follow-up. Twitter retains different types of information for different time periods. Given Twitter's real-time nature, some information may only be stored for a very brief period of time. Information on our retention policies can be found in our Privacy Policy (https://twitter.com/privacy). Please note that for Twitter accounts reported to NCMEC, we provide a copy of the preserved files, mentioned above, within the report in the form of a .zip file.

16.     Based on Twitter's terms, rules, and policies, a user that is caught by Twitter engaging in child sexual exploitation should expect to be immediately and permanently suspended from the account, and that Twitter would preserve the contents of the account, including any child

sexual exploitation material, for disclosure in a subsequent report to a third party (NCMEC). Once detected (and suspended) for this type of violation, under Twitter's terms, rules, and policies, a user such as "outdoor21man2" would have no longer have any reasonable expectation of privacy in the account, as Twitter would have excluded him from access and exercised unilateral control over all of the content within the account.

### Identification of Bradley WILEY in Wichita, Kansas

17.     Based upon geolocation of IP addresses associated with the account, the CyberTipline Report was made available to the Kansas Internet Crimes Against Children Task Force (KS ICAC). Because of geolocation data in the report associated with Olathe, Kansas, the report was referred to Detective Jonathan Nicholas with the Olathe Police Department (Kansas). However, Det. Nicholas determined Bradley WILEY to be a resident of Wichita, Kansas, such that the report was referred to the KS ICAC.

18.     On August 30, 2021, Det. Sandy Mackey of the KS ICAC began her review of the account information provided by Twitter and NCMEC. Based upon her research into the Twitter account, Det. Mackey determined the phone number associated with the Twitter account (530-592-8157) and the name in the Twitter account's associated email, "bradleywiley1604@gmail.com" were both associated to an active duty Air Force member, Bradley WILEY. Det. Mackey contacted the Air Force Office of Special Investigations to refer the investigation.

19.     On September 7, 2021, I began a review of the Cybertip and Twitter account information provided by Twitter for the user "outdoor21man2." I reviewed the content of the reported image (described above). I also opened and reviewed the .zip file containing the account information. The account information indicated the account had been suspended on May 26, 2021.

20.    The account information identified the email associated with the Twitter account was "bradleywiley1604@gmail.com", and the phone number associated with the Twitter account was (530) 592-8157. This phone number was a verified number which would have received a confirmation message when WILEY created his account or added his phone number to the account.[7]

21.    I conducted a search of the phone number on the McConnell Air Force Base Alpha Roster which documents biographical data on active duty members assigned to McConnell Air Force Base. The search resulted in one member with the phone number (530) 592-8157. The member listed was SSgt BRADLEY WAYNE WILEY, 22 Maintenance Squadron, MAFB, KS, an active duty enlisted member in Title 10 status.

22.    The Alpha Roster also listed WILEY's home address as 1945 N. Rock Rd., Apt 1605, Wichita, Kansas.

23.    A search for BRADLEY WILEY on the Air Force Portal (an online resource that grants Air Force members abilities to access a number of personnel and administrative websites to handle personal and professional tasks) showed that WILEY's personal email address was listed as "bradleywiley1604@gmail.com".

24.    In light of the suspended status of the account (such that WILEY would have been excluded from the account due to the violation of terms of service), I engaged in further review of the account information (the .zip file provided by Twitter).[8] The information disclosed by Twitter included direct messages between WILEY and other Twitter users. These included the following:

---

[7] Available online at: https://help.twitter.com/en/managing-your-account/how-to-update-your-account-phone-number

[8] *See, e.g., United States v. Ackerman*, 296 F. Supp. 3d 1267, 1272 (D. Kan. 2017), aff'd, 804 F. App'x 900 (10th Cir. 2020) (holding user cannot establish an objectively reasonable expectation of privacy when the provider terminates the account following violation of terms of service.) *See*

a. On June 24, 2020, WILEY started a conversation with a Twitter user which read, "Where r u from? I'll rape you then force you to help me rape your underage friends." WILEY asked the user how old she was and the age of her underage friends. She responded, "I'm 17. My youngest underage friend is 15z." On November 15, 2020, WILEY stated, "my darkest fantasy is to throat fuck a newborn girl to death". WILEY continued, "I wanna feel a little toothless jaw and throat split open on my cock." WILEY requested that the user let him kidnap her and turn her into a sexual slave. WILEY and the user continued their conversation of having offspring as a result of their sexual encounters. WILEY and the user agreed that any children they created would be used as sex toys for WILEY's pleasure. WILEY discovered that she had a sister that had recently had a baby girl. WILEY suggested that the user should attempt to babysit her niece as much as possible and start grooming the child. WILEY told her that she should, "suck that baby clit and finger her asshole." WILEY explained, "I saw a vid once of a man pounding into a 2 year old cunt" and "It's screaming was glorious." WILEY continued, "Wonder what a newborn would sound like." On April 19, 2021, WILEY told the user that she should provide WILEY with pictures of her newborn niece so that he could masturbate to them.

b. On January 14, 2021, WILEY requested another Twitter user show him "that 12 year old pussy girl." This user responded with a photo (file number: 1349959549382520836.jpg) which depicted a close up photo of a vagina. On April

---

*also United States v. Irving*, 347 F. Supp. 3d 615, 622–23 (D. Kan. 2018) (discussing *Ackerman*, noting "AOL did take action against him (terminated the defendant's account) after he failed to comply with the TOS. Accordingly, the Court found that he lacked a reasonable expectation of privacy in that email.")

6, 2021, WILEY told this user, "Let's see that ass." The user sent WILEY a photo (file number: 1379225177100288006.jpg) which depicted a close up photo of what appeared to be an individual spreading their buttocks, exposing their anus and pubic region. WILEY asked this user where she was from. She stated Virginia and WILEY stated he was in Kansas. WILEY continued, "so far" and "how would you like to be kidnapped and kept as a sex slave someday." WILEY sent this user a video file which depicted a white male stroking his penis in bed (no face was visible in the video). WILEY stated, "The dick I would pound you with." The user sent WILEY a video (file number: 1379227860901191685-SANB5CWtSLZ54UfzqNTyvkZyneEK9vsnqOoV8vyd8w.mp4) which depicted a female inserting the handle of a brush into her vagina.

c. On January 26, 2021, WILEY asked another Twitter user how old she was. This user stated she had just turned 16. WILEY stated, "Now show me your virgin cunt." The user sent a photo (file number: 1353877754635313158-6C2Jk7Zh.jpg) which depicted a close-up photo of a vagina being spread open by a hand. WILEY requested the user to "send me a pic of your ass now." The user sent a photo (file number: 1353879407312728070-li7NFHxv.jpg) which depicted a female kneeling on the floor with her back to the camera. The female was wearing shorts which had been pulled down to reveal her buttocks. WILEY requested she show him another photo of herself without the jean shorts on "And to spread the legs too bitch." The user sent a photo (file number: 1353880044712685571-qtP4nW3w.jpg) which depicted the female kneeling in front of the camera facing away. The female was spreading her buttocks open to expose her anus. WILEY instructed her to face the

camera and sit on her legs while pinching her nipples. The user sent a photo (file number: 1353881542901329926-RUsAKkzT.jpg) which the female's legs spread and her vagina clearly exposed. The female was also pinching both of her nipples with her fingers. WILEY told her to "Send me a short vid of you playing with your cunt and tits." The user sent WILEY a video (file number: 1353885881317392390-Yqq6-tJ2pHAfP_BguiALu1hoZpse-5hU_rhQh-f5UnQ.mp4) which depicted the female rubbing her vagina with her hand then rubbing and squeezing her breasts with her hands.

    d.   On May 26, 2021, WILEY asked another Twitter user if they wanted any illegal porn material. WILEY sent the user the image that Twitter originally flagged and forwarded to NCMEC. WILEY relayed "I used to have so much good taboo stuff. But sadly now I only have a few handfuls of pics."

25.    Based on the content of the reported image, probable cause exists to believe the reported Twitter account has been used to distribute child pornography. Additionally, based on the content of the direct messages between the Twitter account and other users, probable causes exists to believe the user of the account has engaged in the production, distribution, receipt, and possession of child pornography.

26.    Additionally, based on the connection of "bradleywiley1604@gmail.com" and phone number (530) 592-8157 to the reported Twitter account, probable cause exists to believe Bradley WILEY is the user and operator of the Twitter account.

27.    Further, probable cause exists to believe the evidence, described in Attachment B, will be found at WILEY's residence, described in Attachment A.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

28.     From my training and experience, and in discussions with other investigators who have conducted child exploitation investigations including investigators at the Kansas Internet Crimes Against Children Task Force, I know the following:

a.   Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b.   Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.   A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world.  Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.   The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e.   The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.   Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any

variety of formats.  A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.  A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device.  Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

h.  As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional (i.e., by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional.  Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

29.  Based on my experience in the investigation of computer-related crimes and the discussions I have had with other investigators who have experience in investigations related to child exploitation, I know there are certain characteristics common to individuals who advertise, distribute, receive, possess, and/or access with intent to view child pornography:

a.  Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.

b.  Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower

the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.   Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain their pictures, films, video tapes, photographs, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, and child erotica, etc. for many years.

d.   Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment. These collections may exist on the individual's current as well as older cell phones, computers and tablets. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e.   Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[9]

f.   Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses (including email addresses), and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

g.   Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

---

[9] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

h. Even if Bradley WILEY uses a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in his home, the RESIDENCE, as set forth in Attachment A, including on digital devices other than the portable device (for reasons including the frequency of "backing up" or "synching" mobile phones and other digital devices).

30. Based on the facts set forth above, your Affiant believes that WILEY, who appears to be the operator of the Twitter account discussed above, and who resides at the RESIDENCE, likely displays characteristics common to individuals who possess, and/or access with intent to view child pornography. Prior to uploading child pornography, he had to first find and obtain the child pornography. Additionally, his messages indicate he has had long-term involvement in child exploitation and child pornography activities.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

31. As described above and in Attachment B, this application seeks permission to search for records that might be found in the RESIDENCE, described in Attachment A, in whatever form they are found. One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

32. Your Affiant submits that if a computer or storage medium is found at the RESIDENCE, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

a. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

33.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the RESIDENCE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish

and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore,

contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.  I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

34.   Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.  Searching computer systems is a highly technical process that requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b.  Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.  The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.  Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

35.     Additionally, based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—

including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network.  Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

36.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### Biometric Access to Devices

37.     This warrant permits law enforcement agents to obtain from **Bradley WILEY** the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) subject to search and seizure pursuant to this warrant. The grounds for this request are as follows:

    a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

38.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

39.     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search.  The passcode or password that would unlock such devices subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

40.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

41.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of

that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the RESIDENCE and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

42.    Due to the foregoing, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant would permit law enforcement personnel to obtain from the aforementioned person, **Bradley WILEY,** the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the device(s) found at the RESIDENCE; (2) hold the device(s) found at the RESIDENCE in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the device(s) found at the RESIDENCE in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

43.    The proposed warrant does not request authority for nor authorize law enforcement to compel any person(s) to state or otherwise provide the password for, or to identify which specific biometric characteristics (including the unique finger(s) or other physical features) may be used to unlock or access, any device(s). However, during the execution of the requested warrant, law

enforcement agents may seek to obtain such information voluntarily from persons present at the RESIDENCE.

## CONCLUSION

44.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A. I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

45.     I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Adam S. Christudoss, Special Agent
Office of Special Investigations (OSI)
United States Air Force


Attested to by the Applicant, in accordance with the requirements of Fed. R. Crim. P. 41(d)(3), by telephone or other reliable electronic means, to wit:  telephonic conferencing on November 4, 2021.

THE HONORABLE KENNETH G. GALE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### RESIDENCE to be Searched

This warrant authorizes the search of the premises and devices located at 1945 N. Rock Rd., Apt 1605, Wichita, Kansas. This RESIDENCE is white with green accents and trim, wood paneled residential apartment building structure, facing South with 1605 on the front door of the apartment and a 16 marked above the doors of the apartment building. Apartment 1605 is a second floor apartment accessible by a first floor entry door, identified in the below photograph as the second green door from the left.

Attached is a photo of the RESIDENCE and its geographical location:





## ATTACHMENT B
### ITEMS TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § § 2251 (Production of Child Pornography) and 2252A (Distribution/Receipt/Possession of Child Pornography):

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which are stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a) evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b) evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c) evidence of the lack of such malicious software;

   d) evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e) evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f) evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g) evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h) evidence of the times the COMPUTER was used;

i) passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j) documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k) records of or information about Internet Protocol addresses used by the COMPUTER;

l) records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m) contextual information necessary to understand the evidence described in this attachment.

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography, as defined in 18 U.S.C. § 2256(8), and child erotica.

5. Records, information, and items relating to violations of the statutes described above including:

a. Records, information, and items relating to the occupancy or ownership of the RESIDENCE (described in Attachment A), including utility and telephone bills, mail envelopes, or addressed correspondence;

b. Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

c. Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

d. Records and information relating to the sexual exploitation of children, including correspondence and communications with or about the minors discussed in the attached Affidavit of probable cause;

e. Records and information showing access to and/or use of cloud storage providers; and

f. Records and information relating or pertaining to the identity of the person or persons using or associated with the Twitter account "outdoor21man2," the phone number 530-592-8157, the email address bradleywiley1604@gmail.com.

6.    During the execution of the search of the RESIDENCE described in Attachment A, law enforcement personnel are authorized to compel **Bradley WILEY** to (1) press or swipe the fingers (including thumbs) of **Bradley WILEY** to the fingerprint scanner of a device found at the RESIDENCE; and/or (2) hold a device found at the RESIDENCE in front of the face of **Bradley WILEY**, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant. [This warrant does **not** authorize law enforcement to compel any person(s) to state or otherwise provide the password for, or to identify which specific biometric

characteristics (including the unique finger(s) or other physical features) may be used to unlock or access, any device(s).]

7.      As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

8.      The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

9.      The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, CD/DVDs, gaming systems, SIM cards, cellular phones capable of storage, memory cards, memory chips, and other magnetic or optical media.